# Supreme Court of the Navajo Nation

**Rough Rock Community School
(Rough Rock School Board, Inc.), et al.,
Appellants,
v.
Navajo Nation, Appellee.
Decided November 8, 1995**

## OPINION

Before YAZZIE, Chief Justice, AUSTIN and CADMAN, Associate Justices.

Lawrence A. Ruzow, Esq., Window Rock, Navajo Nation (Arizona), for the Appellants; and Frank M. Seanez, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by AUSTIN, Associate Justice.

This is an appeal from judgments and orders of the Window Rock District Court which dismissed all the Appellants' claims. They appeal to challenge the validity of certain sections of the 1990 Navajo Nation Election Code, 11 N.T.C. §§ 1-380, and its application to them.

I

The Appellants are Rough Rock Community School, Ramah Navajo Community School, Borrego Pass Community School, each school's respective local school board, and the Rough Rock Chapter. Each of the schools is located within the exterior boundaries of the Navajo Nation and each is incorporated under either the laws of Arizona or New Mexico.

On April 6, 1990, the Navajo Nation Council enacted the 1990 Navajo Nation Election Code. Section 11.B of the Code directed the Education Committee of the Navajo Nation Council to set the size of school boards and apportion school board seats among the chapter or chapters represented by each school board. After developing and approving an apportionment plan, the Education Committee was directed to submit the plan to the Navajo Nation Board of Election Supervisors for use in the next elections. 11 N.T.C. § 11.C.

On November 6, 1991, the Education Committee approved Resolution ECN-72-91 which adopted an apportionment plan for certain Navajo school boards. The plan set the number of school board members to be elected to each board and

determined which chapter(s) would be involved in the election of each board. The plan directed that the school boards be selected and constituted in a manner different than that stated in the Appellant schools' Articles of Incorporation or corporate by-laws. The Board of Election Supervisors received the apportionment plan, but it was not submitted to the Navajo Nation Council for approval. The plan was first used in the 1992 School Board Elections.

Section 2.EE of the Election Code defines school board members as follows:

> Members of a local school board who are elected during chapter and/or special elections. Officers organized under the laws of the Navajo Nation charged with the administration of the affairs of the Bureau of Indian Affairs and other schools *excluding private*, parochial, and state schools. (emphasis supplied).

School board candidates must meet certain eligibility requirements: they must be enrolled Navajos; be registered voters in the chapter they wish to represent; be at least 21 years old; must not have been convicted of a felony within five years prior to their candidacy; must not have been convicted of certain misdemeanors involving children; and "*[m]ust have demonstrated interest, experience and ability in Educational Managaent* and must be able to communicate such to Navajo communities." 11 N.T.C. § 8.D.4(a)-(i) (emphasis supplied). The Election Code does not define "Educational Management."

The Appellants filed a complaint in the Window Rock District Court on April 28, 1992 seeking declaratory and injunctive relief. First, the Appellants claimed that the Election Code and the Education Committee's apportionment plan did not apply to them because they were private, and therefore, explicitly excluded under section 2.EE of the Election Code. Second, the Appellants claimed that section 8.D.4(i) of the Election Code was void for vagueness or illegally restricted the right of Navajos to run in school board elections. Third, the Appellants claimed that the Education Committee violated section 11.C of the Election Code by failing to consult with them and their respective chapters when developing the apportionment plan. Fourth, the Appellants claimed that the Board of Election Supervisors violated section 11.E of the Election Code because it failed to arbitrate the dispute between the Appellants and the Education Committee in a fair and appropriate manner. Fifth, the Appellants claimed that the apportionment plan denied their equal protection and due process rights in that the make-up of the Appellant school boards would be inconsistent with that of school boards in other chapters. Finally, the Appellants claimed that the apportionment plan was not presented to the Navajo Nation Council as required by section 321.A.8 of the Election Code.

At the District Court's request, a hearing was held for the parties to present evidence on whether the Appellant schools were "private schools." On July 31, 1992, the District Court ruled that the Appellant schools were not "private schools" for purposes of the Election Code and denied the Appellants' request to enjoin the August 4, 1992 School Board Elections.

In reaching its decision, the court considered and weighed the following facts: the schools were located within the exterior boundaries of the Navajo Nation; the schools were incorporated under the state laws of either Arizona or New Mexico; community organizing efforts at the local chapter level resulted in the creation of the schools; resolutions of the respective chapters authorized the initial plans to implement the schools; the school board elections have been held at duly called chapter meetings; the school board members are accountable to the chapter; the Navajo Nation Council required the schools to be certified as "tribal organizations" to receive federal grants; the schools receive 100% of their funding from federal grants; the schools hire their employees in accordance with their own policies and procedures, and purchase their own equipment and classroom materials; the schools do not own the land or buildings where they conduct educational activities; and the schools do not charge their predominantly Navajo students tuition.

A trial was held on the remaining issues. After the Appellants presented their case, the Navajo Nation moved for involuntary dismissal of the Appellants' remaining claims pursuant to Rule 39(b) of the Navajo Rules of Civil Procedure. The District Court reserved decision on this motion until the Navajo Nation presented its case.

On February 14, 1994, the District Court granted the Nation's motion for involuntary dismissal and dismissed all of the Appellants' remaining claims.

The Appellants appealed the dismissal and, on August 26, 1994, this Court granted the Appellants' motion to divide the issues on appeal. Therefore, this appeal is limited to the Appellants' first, second, and sixth claims, as stated above. Oral argument was heard on April 25, 1995 at Stanford Law School in Palo Alto, California.

## II

The following are the issues on appeal:

1. Does the 1990 Navajo Nation Election Code, 11 N.T.C. §§ 1-380, apply to the Appellant schools?

2. If the Election Code does apply to the Appellant schools, does section 8.D.4(i) of the Election Code illegally restrict the right of Navajos to be candidates for the school boards of the Appellant schools?

3. If the Election Code does apply to the Appellant schools, does the failure of the Education Committee or the Board of Election Supervisors to submit the apportionment plan to the Navajo Nation Council for approval, pursuant to section 321.A.8 of the Election Code, invalidate the apportionment plan?

## III

This Court must determine if the Appellant schools are "private," "public," or "other schools" to determine if the Election Code applies to the Appellants. If the schools are "private schools," they are explicitly excluded from the application

of the Code pursuant to that portion of section 2.EE which states as follows: "Officers organized under the laws of the Navajo Nation charged with the administration of the affairs of the Bureau of Indian Affairs and *other schools excluding private, parochial and state schools*. ( emphasis supplied).

The District Court held that the schools were neither "public" nor "private," but "local community schools," and, therefore, were "other schools" within the meaning of section 2.EE. The District Court refused to enjoin enforcement of the Election Code against the Appellants.

American law contains little helpful guidance in pinpointing a definition for "private schools." One court defined "private schools" as schools operated by private interests as a substitute for instruction required in public schools operated by municipalities. *Clark v. Planning and Zoning Comm'n of Town of Westport*, 210 A.2d 320, 321 (Conn. 1965). Other courts add the requirement of support and management by individuals. *See Flagg v. Murdock*, 15 N.Y. S.2d 635, 637 (N.Y. Sup. Ct. 1939); *Livingston v. Davis*, 50 N.W.2d 592, 596 (Iowa 1951).

Some federal and state courts have defined "private schools" as "non-public schools," therefore, definitions of "public schools" may provide some direction. The most common trait of "public schools" found by these courts is support from the local community through taxes. See *Cook v. School District No. 12*, 21 P. 496, 497 (Colo. 1889); *Reizel, Inc. v. Exxon Corp.*, 349 N.Y. S.2d 14, 18-19 (N.Y. App. Div. 1973); *Pizza Hut of America, Inc. v. Pastore*, 519 A.2d 592, 594 (R.I. 1987); *Newman v. Schlarb*, 50 P.2d 36, 39 (Wash. 1935). Another common characteristic of "public schools" is control by a local governmental authority. See *Reizel, Inc.*, 349 N.Y. S.2d at 19; *Worcester Vocational Teachers Association v. City of Worcester*, 429 N.E.2d 718, 720-21 (Mass. App. Ct. 1982); *Traverse City School Dist. v. Attorney General*, 185 N.W.2d 9, 19 (Mich. 1971).

In weighing the characteristics of the Appellant schools, this Court finds insufficient evidence to warrant a reversal of the District Court's decision. The schools do not provide education that is a substitute for instruction that is otherwise required in public schools, nor do independent individuals financially support or manage the schools.

On the contrary, as the District Court found, the schools receive 100% of their financial support from the federal government. Although the schools use their own policies and procedures to hire their employees, and purchase their own equipment and classroom materials, local community organizing efforts spawned the creation of the schools, and the respective chapter resolutions authorized the schools' initial plans prior to operation. Furthermore, the school board elections have been held at chapter meetings, the school board members are ultimately responsible to the chapter, and the Navajo Nation Council had to certify them as "tribal organizations" to receive federal grants under the Indian Self-Detemination and Education Assistance Act of 1975, 25 U.S.C. § 450a-450n.

It is therefore obvious that while the schools remain minimally self-sufficient, they have been inextricably intertwined with the Navajo Nation government and

their local Navajo communities from their inception. The Appellant schools have characteristics of both public and private schools; therefore, we agree with the District Court that the schools are "local community schools," or "other schools" under the meaning of section 2.EE of the Election Code. We hold that the Election Code applies to the Appellants. The District Court's ruling on this issue is affirmed.

## IV

Section 8.D.4(i) of the Election Code provides that school board candidates "[m]ust have demonstrated interest, experience, and ability in Educational Management and must be able to communicate such to the Navajo communities." "Educational Management" is not defined in the Code. The Appellants argue that the Educational Management requirement violates Navajo common law and the American concept of political liberty interests because it illegally limits the right of Navajos to be candidates for the school boards of the Appellant schools. The Appellants also claim that because the statute does not define "Educational Management," this Court should find the section void for vagueness.

Both parties rely on the standards set forth in *Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319 (1990). It is apparent from the briefs that our holding in *Bennett* confuses both parties, hence, we take this opportunity to clarify that decision. Breach of political liberty and vagueness under Navajo common law are related but different issues. This distinction is the source of the parties' confusion.

### A. Political liberty

Navajo common law is the law of preference in the Navajo Nation courts. *Navajo Nation v. Platero*, 6 Nav. R. 422 (1991). In *Bennett*, we discussed the Navajo concept of *beehaz'aanii*. This concept refers to a higher law which we described as follows:

> It means something which is 'way at the top'; something written in stone so to speak; something which is absolutely there; and, something like the Anglo concept of natural law. In other words, Navajos believe in a higher law, and as it is expressed in Navajo, there is a concept similar to the idea of unwritten constitutional law.

*Bennett, id.,* at 324.

Navajo customs and traditions that are fundamental and basic to Navajo life and society are higher law. *Id.* Thus, in *Bennett*, we acknowledged that Navajo *beehaz'aanii* includes the concept of political liberty, a due process right, and applied the Navajo common law, rather than the American concept, of political liberty.

The Appellants confuse the Navajo and American concepts of political liber-

ty in their argument. Navajo common law acknowledges that "there is a strong and fundamental tradition that any Navajo can participate in the processes of government, and *no person who is not otherwise disqualified by a reasonable law can be prohibited from holding public office.*" (emphasis supplied). *Bennett, id.* at 325. This creates a mere reasonableness standard. The American standard is a more stringent standard. It requires a showing that not only is the statutory restriction reasonable, but also that it forwards some governmental interest. *Id.* The Appellants claim that the applicable standard set forth in *Bennett* is the more harsh American standard. However, the standard in *Bennett* is only a reasonableness standard and it is the standard that we follow here.

Navajo parents historically had no say in the education of their children until passage of the Indian Self-Determination and Education Assistance Act of 1975. The Bureau of Indian Affairs managed Indian education with its usual overbearing bureaucracy and non-Navajo school boards dictated policy in the state schools. Congress realized that Indian people must take control of educating their children and, in the late 1960's, began "encouraging education of Indian children in schools administered by Indian tribes and organizations rather than by states." *Cohen's Handbook of Federal Indian Law* 694 (1982 ed.). The mechanism for such control is Title I of the Indian Self-Determination and Education Assistance Act of 1975, which requires the Secretary of the Interior "to contract with tribal organizations" for the administration of Indian programs, including education. *Id.*

Congressional policy requires Indian control over the education of Indian children. *Id.* That policy is implemented in the Navajo Nation through Navajo grassroots participation on local school boards and in setting standards for the education of Navajo children in contract schools. Section 8.D.4 (i) of the 1990 Election Code, with its "Educational Management" requirement, unreasonably restricts that grass-roots participation. Parents and community members certainly have a significant stake in the education of their children.

Accordingly, we hold that section 8.D.4(i) of the 1990 Election Code is an unreasonable restriction which denies Navajos the right to seek election to Navajo school boards. The Navajo Nation has not shown to this Court that the "Educational Management" restriction is a reasonable restriction on the Nation's Peoples' political liberty.

## B. Vagueness

Legislation which creates discretionary authority must not permit abuses of that authority. The portion of the Election Code which is challenged here as vague requires that school board candidates "[m]ust have demonstrated interest, experience, and ability in Educational Management...." How can a candidate or the Board of Election Supervisors know who possesses such qualities? While we hold that the Navajo Nation has the authority to regulate school board elections for the Appellant schools, and while the vesting of discretion in public bodies is

a fundamental element of administrative law, the problem is that while the statute vests discretion, it also permits abuses of that discretion.

The federal policy which underlies the creation of contract schools is central to this issue. As we noted, contract schools are funded as "tribal organizations" under the Indian Self-Determination and Education Assistance Act of 1975. The Bureau of Indian Affairs delayed implementation of the Act, so Congress enacted the following policy in the Education Amendments of 1978: "It shall be the policy of the Bureau, in carrying out the functions of the Bureau, to facilitate Indian control of Indian affairs in all matters relating to education." 25 U.S.C. § 2010; *Cohen's Handbook of Federal Indian Law* at 694. "Indian control," as a matter of Navajo Nation public policy, means the Navajo Nation Council, in election law, may set reasonable qualifications for school board members.

In *Bennett*, we held that statutes which implement liberty rights must have ascertainable standards. 6 Nav. R at 327. We also adopted the following three-prong test to determine whether a statute is void for vagueness:

> 1) the statute must be one which the ordinary person, exercising ordinary common sense, can understand; 2) candidates and election officials should not guess the meaning of the statute; and 3) the statute must not cause people to differ as to its application.

*Id.* at 326.

The "ascertainable standard" principle drives the three-prong test. A "standard" is a requirement. In an election code, it is a precondition to run for public office. To ascertain is "[t]o make certain and definite." *The American Heritage Dictionary of the English Language* 76 (1981 ed.). If the legislature does not make a standard or statutory requirement "certain and definite," confusion prohibited by the three-prong test results.

Statutes which limit political liberty must be based upon reasonable public policy and they must give the regulating body concrete guidance as to their application. A statute must contain clear and objective measures of the standard to be applied to prevent abuses of discretion. Here, the Board of Election Supervisors has the authority to determine who may or may not have a "demonstrated interest, experience, and ability in Educational Management" without any objective means to challenge its determination. For that reason, the statute is vague.

Ascertainable standards in the sense of making things "certain and definite" is a Navajo common law requirement as well. In the process of "talking things out," or meeting the Navajo common law procedural requirement that "everything must be talked over," there is a requirement of *ashjoni adoolnil* (making something clear or obvious). Navajo decision-making is practical and pragmatic, and the result of "talking things out" is a clear plan. The Navajo Nation Council did not make an important precondition to school board candidacy clear, obvious, certain or definite. In other words, it did not follow the Navajo traditional requirement of *ashjoni adoolnil*, and for that reason, the "Educational

Management" requirement is void for vagueness. The standard was not objective but instead delegated unregulated discretion which could lead to manipulation and abuses of authority. Navajo thought deplores abuses of authority because of the consensual and egalitarian principles of governance. Any statute which permits such unregulated abuses of discretion in derogation of the Navajo common law is void.

## V

The Appellants argue that the apportionment plan is void because the Navajo Nation Council did not debate and approve it. The Appellants rely on section 321.A.8 of the Election Code which states that the general powers and duties of the Board of Election Supervisors is "[t]o develop and recommend to the Navajo Nation Council all apportionment plans for election purposes."

However, section 11.B of the Election Code specifically provides a procedure for the development of an apportionment plan for school board elections:

> The *Education Committee* of the Navajo Nation Council *shall set the size of each school board and shall apportion the number of school board seats among the Chapter or Chapters represented on each school board.* (emphasis supplied).

From this language, it is clear the Navajo Nation Council has delegated the Education Committee as the appropriate body to finally approve all school board apportionment plans. We find the Appellants' claim without merit; therefore, we affirm the District Court's decision.

## VI

In summary, we affirm the Window Rock District Court's ruling that the Appellant schools are not "private schools" under the meaning of the 1990 Navajo Nation Election Code, and the Election Code therefore applies to them. We reverse the District Court's ruling that section 8.D.4 (i) does not violate the due process right to political liberty of Navajos to become school board candidates and hold that section 8.D.4(i) of the 1990 Navajo Nation Election Code is void. Finally, we affirm the District Court's ruling that the apportionment plan is not void and is applicable to the Appellants.